**United States District Court**

For the Northern District of California

1

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7

8                    FOR THE NORTHERN DISTRICT OF CALIFORNIA

9   In re DITECH COMMUNICATIONS CORP.
    SECURITIES LITIGATION

10                                                No. C 05-02406 JSW

11

12   This Document Relates To:
                                                  **ORDER GRANTING MOTION TO**
     ALL ACTIONS.                                 **DISMISS WITHOUT PREJUDICE**

13

14                                              /

15          Lead plaintiffs Jack Casey, Tonio Dahmen, George Innocenti, Shengli Duan and Norbert

16   P. Czub (collectively "Plaintiffs") bring this action individually and on behalf of all other

17   persons who purchased or otherwise acquired the common stock of defendant Ditech

18   Communications Corporation, which subsequently changed its name to Ditech Networks, Inc.,

19   ("Ditech"), between August 24, 2004 and May 26, 2005 (the "Class Period"),[1] pursuant to

20   Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and

21   78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17

22   C.F.R. 240.10b-5.

23          Now before the Court is the motion to dismiss the Amended Class Action Complaint

24   ("ACAC" or "Complaint") filed by defendants Ditech, Timothy K. Montgomery

25   ("Montgomery"), and William J. Tamblyn ("Tamblyn") (collectively "Defendants").

26   Defendants move to dismiss asserting that Plaintiffs fail to meet the heightened pleading

27   requirements of the Private Securities Litigation Reform Act ("PSLRA").  Defendants further

28

---

[1]     The Court has not yet certified a class and refers to the time period involved as
the "Class Period" for ease of reference.

**United States District Court**

For the Northern District of California

1   assert that allowing amendments to the Complaint would be futile and request that the Court

2   dismiss this action with prejudice. Having carefully reviewed the parties' papers, considered

3   their arguments and relevant legal authority, and having had the benefit of oral argument, the

4   Court hereby GRANTS Defendants' motion to dismiss with leave to amend.

5                                           **FACTUAL BACKGROUND**

6          Ditech is a publicly traded company and is based in California. Ditech designs and

7   markets telecommunications equipment. (ACAC, ¶ 2.)

8          Defendant Timothy K. Montgomery was for all relevant periods Ditech's Chief

9   Executive Officer. (*Id.*, ¶ 14.) Defendant William J. Tamblyn was for all relevant periods

10  Ditech's Chief Financial Officer. (*Id.*, ¶ 15.) Montgomery sold 225,000 shares of Ditech

11  common stock during the class period for proceeds of $4,491,900 and Tamblyn sold 25,000

12  shares of common stock during the class period for proceeds of $614,142. (*Id.*, ¶¶ 14, 15.)

13                                  **Voice Quality Assurance Orders**

14         Plaintiffs allege that during the Class Period, Defendants represented that they received

15  two orders totaling over five million dollars for Voice Quality Assurance ("VQA") from new

16  customers in Asia. (*Id.*, ¶¶ 4(a), 29.) VQA is a Ditech technology that enhances the clarity of

17  wireless telephone calls. Ditech announced that it had "secured" two large orders for its VQA

18  solutions by two new customers in Asia. (*Id.*, ¶ 29.) If these orders had been realized, they

19  would have raised Ditech's second quarter revenue to $29,253,000, or by seventeen percent.

20  (*Id.*, ¶ 4(a).) Plaintiffs allege that "[t]he purported customers were not obligated to, and, as it

21  turned out, did not purchase the services." (*Id.*, ¶ 4(a).)

22         On a conference call with analysts and investors held on August 24, 2004, Montgomery

23  stated: "Although we don't know yet precisely where Q2 VQA revenues will be, given our Q4

24  revenues and orders in excess of $5 million already in Q2, you can see the beginning of a trend

25  line that gives us real confidence in our VQA business." (*Id.*, ¶ 30.) Plaintiffs allege this

26  statement made was false because the VQA orders were not "secured;" the new clients had the

27  right to change their minds about the orders and Defendants lacked any basis to express "real

28  confidence" in its VQA business. (*Id.*, ¶ 34.)

**United States District Court**

For the Northern District of California

1    Plaintiffs further allege that "the truth about the purported VQA orders" began to emerge

2  when Ditech announced on November 3, 2004, that these orders had not yet shipped.

3  "Defendants, however, maintained that this was merely a 'delay' and that they still expected the

4  orders to ship." (*Id.*, ¶ 5.)  Montgomery stated in a press release issued on November 3, 2004:

5  "Although our revenues were 67% higher than the same quarter last year we did not achieve our

6  revenue goal. ... The revenue shortfall was the result of two factors.  First, we experienced a

7  delay in shipping a major VQA order in the quarter to an Asian customer.  We are taking steps

8  to facilitate the smooth delivery of this order in the second half of this year." (*Id.*, ¶ 35.)  During

9  a conference call later that day, Montgomery stated: "In August, we announced that we'd

10  secured orders in excess of $5 million from customers in Asia.  During the Q1 conference call,

11  we indicated that we thought we would ship $2 to $3 million in VQA in the second quarter.

12  Due to management changes within the largest of these firms, subsequent to booking the order,

13  the delivery schedule changed.  The customer has now reconfirmed the new shipping schedule

14  and we're taking steps to ensure smooth delivery of these orders in the second half of this fiscal

15  year." (*Id.*, ¶ 36.)

16    Plaintiffs allege that Montgomery reiterated that the VQA issue was one of timing and

17  that the Company did not lose the transactions when he stated: "Not trying to be too granular

18  here, but the issue of VQA is not a matter of losing transactions, it's a matter of delays.  Delays

19  associated with the magnitude of the opportunities and the, shall we say, the magnitude of the

20  competitive landscape." (*Id.*, ¶ 36.)

21    On November 18, 2004, on a conference call, Tamblyn reassured investors regarding the

22  VQA orders: "The order [to an Asian customer] remains valid and we are taking steps to

23  facilitate the smooth delivery of this order in the second half of the fiscal year." (*Id.*, ¶ 38.)

24    As support for Plaintiffs' contention that Defendants' representations regarding the VQA

25  orders from the Asian customers were false when made, Plaintiffs point to the following

26  statement made by Montgomer during a conference call held on November 3, 2004: "I'm happy

27  to say that I don't have a loss report associated with VQA.  I have a delay report that suggests

28

there are other things we need to do to win the business."  However, this statement was made in

response to a question regarding Ditech's *domestic* VQA trials.  (North Decl., Ex. B.)

### Nextel-Sprint Merger

On December 15, 2004, Nextel announced a merger with Sprint.  (ACAC, ¶¶ 4(b), 39.)

Before the merger, Nextel represented 42% of Ditech's business.  (*Id*., ¶ 4(b).)  Plaintiffs allege

that Defendants "represented that the merger should not be of concern to Ditech investors and

that it was 'quite good' for the Company."  (*Id*., ¶¶ 4(b), 42.)  Defendants made this alleged

statement on February 17, 2005.  (*Id*., ¶ 42.)  Plaintiffs further allege that Defendants knew or

recklessly disregarded that the merger posed a serious threat to Ditech's business.  (*Id*., ¶ 43.)

On a conference call on February 17, 2005, Montgomery stated: "The Nextel-Sprint

merger is actually, we think, quite good for us in that the key strategic people on the technical

side are actually going to be the Nextel players, and this is what we've seen publicly announced.

So we think that's positive, but we also have an account team calling on Sprint directly in

Kansas City, which we're hopeful the 2 points lead to the right end."  (*Id*., ¶ 42.)  On May 26,

2005, Ditech revealed the "truth" about the Nextel-Sprint merger.  (*Id*., ¶ 6.)

### Scienter Allegations

Plaintiffs allege that during the Class Period, Montgomery sold 25,000 shares of Ditech

stock every two weeks between August 26, 2004 and December 16, 2004 at prices between

$26.10 and $15.28, amounting to a total of 225,000 shares for $4,491,900.  (*Id*., ¶ 58.)  The

225,000 shares were less than 13 percent of Montgomery's stock holdings at that time.  (North

Decl., Ex. O.)  Plaintiffs allege that Montgomery did not sell any stock between August and

December 2003, but does not allege what stocks, if any, Montgomery sold between December

2003 and August 2004.  (ACAC, ¶ 60.)  Based on documents filed with the SEC, Montgomery

sold a total of 320,000 shares of Ditech stocks for $6,715,917 during April through July 2004,

the four months before the Class Period began.  (North Decl., Ex. I.)  During this period,

Montgomery sold 25,000 shares approximately every two weeks, plus an additional 120,000

shares in late June 2004.  (*Id*.)

United States District Court

For the Northern District of California

4

**United States District Court**

For the Northern District of California

1    Plaintiffs allege Tamblyn sold 25,000 shares of Ditech stock on October 4, 2004 at

2    prices between $24.56 and $24.66, amounting to a total of $614,142.  (ACAC, ¶ 58.)  The

3    25,000 shares were just over 3 percent of Tamblyn's stock holdings at that time.  (North Decl.,

4    Ex. O.)  Plaintiffs allege that Tamblyn did not sell any shares in October 2003, but does not

5    allege what stocks, if any, Tamblyn sold between October 2003 and October 2004, or after

6    October 2004.  (ACAC, ¶ 60.)

7    Plaintiffs also allege that during the Class Period non-defendant Ditech insiders, Vice-

8    President of Worldwide Sales, James Grady, sold 27,500 shares for $626,315, Vice-President of

9    Operations, Lowell Trangsrud, sold 20,000 shares for $470,500, and Director, David Sugishita,

10   sold 22,500 shares for $516,158.  (ACAC, ¶ 58.)  The aggregate of sales by insiders identified in

11   the Complaint amount to nine percent of the total holdings by the identified insiders, and only

12   seven percent of the combined holdings of all Ditech directors and executive officers.  (North

13   Decl., Ex. O.)  The aggregate sales by Montgomery and Tamblyn, the only individual

14   defendants, amount to seven percent of the holdings by the officers and directors identified in

15   the Complaint and less than six percent of all Ditech executive officers and directors' holdings.

16   (*Id.*)

17                                          **ANALYSIS**

18   Plaintiffs allege that throughout the Class Period Defendants publicly made

19   misrepresentations concerning VQA orders and the Sprint-Nextel merger.  Section 10(b) of the

20   Securities Exchange Act provides, in part, that it is unlawful "to use or employ in connection

21   with the purchase or sale of any security registered on a national securities exchange or any

22   security not so registered, any manipulative or deceptive device or contrivance in contravention

23   of such rules and regulations as the [SEC] may prescribe."  15 U.S.C. § 78j(b).

24   Rule 10b-5 makes it unlawful for any person to use interstate commerce:

25   (a)    To employ any device, scheme, or artifice to defraud;

26   (b)    To make any untrue statement of material fact or to omit to state a material fact
             necessary in order to make the statements made, in light of the circumstances
             under which they were made, not misleading, or;

27   (c)    To engage in any act, practice, or course of business that operates or would
             operate as a fraud or deceit upon any person, in connection with the purchase or

28           sale of any security.

5

1   17 C.F.R. § 240.10b-5.

2          To plead a claim under section 10(b) and Rule 10b-5, a plaintiff must allege (1) a

3   misrepresentation or omission, (2) of material fact, (3) made with scienter, (4) on which the

4   plaintiff justifiably relied, (5) that proximately caused the alleged loss. *Binder v. Gillespie*, 184

5   F.3d 1059, 1063 (9th Cir. 1999). Additionally, as in all actions alleging fraud, a plaintiff must

6   state with particularity the circumstances constituting fraud. *Greebel v. FTP Software, Inc.*, 194

7   F.3d 185, 193 (9th Cir. 1999); Fed. R. Civ. P. 9(b).

8          Plaintiffs also claim that individual defendants are liable pursuant to Section 20(a) of the

9   Securities Exchange Act, which provides for derivative liability for those who control others

10  found to be primarily liable under the provisions of that act. *See In re Ramp Networks, Inc. Sec.*

11  *Lit.*, 201 F. Supp. 2d 1051, 1063 (N.D. Cal. 2002). Where a plaintiff asserts a Section 20(a)

12  claim based on an underlying violation of section 10(b), the pleading requirements for both

13  violations are the same. *Id.*

14  **A.      Applicable Pleading Standards: Private Securities Litigation Reform Act.**

15         In order to limit the number of frivolous private securities lawsuits, Congress enacted the

16  PSLRA in December of 1995, and created heightened pleading standards for such lawsuits. 15

17  U.S.C. § 78u-4(b). The PSLRA requires that "the complaint shall specify each statement

18  alleged to have been misleading, the reason or reasons why the statement is misleading, and, if

19  an allegation regarding the statement is made on information and belief, the complaint shall

20  state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B).

21  Furthermore, the PSLRA requires that the plaintiff "state with particularity facts giving rise to a

22  strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-

23  4(b)(2).

24         The heightened standard set by the PSLRA was intended to put an end to securities fraud

25  lawsuits that plead "fraud by hindsight." *In re Silicon Graphics, Inc. Sec. Lit.*, 183 F.3d 970,

26  988 (9th Cir. 1999). "The PSLRA significantly altered pleading requirements in private

27  securities fraud litigation by requiring that a complaint plead with particularity both falsity *and*

28  scienter." *In re Vantive Corp. Sec. Lit.*, 283 F.3d 1079, 1084 (9th Cir. 2002) (citing *Ronconi v.*

*United States District Court*

For the Northern District of California

**United States District Court**

For the Northern District of California

1    *Larkin*, 253 F.3d 423, 429 (9th Cir. 2001)) (emphasis added).  "Thus the complaint must allege

2    that the defendant made false or misleading statements either intentionally or with deliberate

3    recklessness or, if the challenged representation is a forward looking statement, with 'actual

4    knowledge . . . that the statement was false or misleading.'"  *Id.* at 1085 (citing 15 U.S.C. § 78u-

5    5(c)(1)(B)(I)).  This is often accomplished "by pointing to inconsistent contemporaneous

6    statements or information (such as internal reports) made by or available to the defendants."

7    *Yourish v. California Amplifier*, 191 F.3d 983, 993 (9th Cir. 1999) (quoting *In re GlenFed Sec.*

8    *Lit.*, 42 F.3d 1541, 1549 (9th Cir. 1991) (*en banc*)); *see also id.* at 994 (discussing insufficiency

9    of plaintiffs' allegations with regard to the non-disclosure of confidential non-public

10   information).

11          Under the PSLRA, a complaint still is construed in the light most favorable to the non-

12   moving party and all material allegations in the complaint are taken to be true.  *Silicon*

13   *Graphics*, 183 F.3d at 983.  To determine whether a plaintiff has pled a strong inference of

14   scienter, however, "the court must consider all reasonable inferences to be drawn from the

15   allegations, including inferences unfavorable to the plaintiffs."  *Gompper v. VISX, Inc.*, 298 F.3d

16   893, 897 (9th Cir. 2002).  The Court "should consider all the allegations in their entirety,

17   together with any reasonable inferences therefrom, in concluding whether, on balance, the

18   plaintiffs' complaint gives rise to the requisite inference of scienter."  *Id.*  "Conclusory

19   allegations of law and unwarranted inferences, however, are insufficient to defeat a motion to

20   dismiss."  *In re Northpoint Communications Group, Inc. Sec. Lit.* (*Northpoint II*), 221 F. Supp.

21   2d 1090, 1094 (N.D. Cal. 2002).

22          Finally, the Court may consider the facts alleged in the complaint, documents attached to

23   the complaint, documents relied upon but not attached to the complaint when the authenticity of

24   those documents is not questioned, and other matters for which the Court can take judicial

25   notice.  *Northpoint II*, 221 F. Supp. 2d at 1094; *see also Silicon Graphics*, 183 F.3d at 986.

26   **B.      Request for Judicial Notice.**

27          Defendants request that the Court take judicial notice of Ditech's press releases, SEC

28   filings, transcripts of Ditech's Earnings Release Conference calls, and Ditech's historical stock

7

1    prices, all of which are referenced in the Complaint, are publicly filed documents, or are

2    otherwise the proper subject of judicial notice.  Plaintiffs do not dispute the accuracy of the

3    documents attached to the request, and the requested documents are the types of documents of

4    which this Court properly may take judicial notice.  *See, e.g., In re Calpine Corp. Sec. Lit.*, 288

5    F. Supp. 2d 1054, 1076 (N.D. Cal. 2003) (court "may properly take judicial notice of SEC

6    filings and documents expressly referenced" in a complaint"); *see also Plevy v. Haggerty*, 38 F.

7    Supp. 2d 816, 821 (C.D. Cal. 1998); *In re Copper Mountain Sec. Lit.*, 311 F. Supp. 2d 857, 864

8    (N.D. Cal. 2004) (information about the stock price of publicly traded companies is a proper

9    subject of judicial notice).  Accordingly, the Court GRANTS Defendants' requests.

10   **C.     Plaintiffs Fail To Plead Sufficient Facts to Demonstrate Falsity.**

11           The PSLRA requires that Plaintiffs allege with the requisite particularity each statement

12   alleged to be false or misleading, the reason or reasons why the statement was false or

13   misleading, and if those allegations are made on information and belief, all facts on which that

14   belief is formed.  *See* 15 U.S.C. § 78u-4(b)(1)(B); *see also Employers Teamsters Local Nos. 175*

15   *and 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1134 (9th Cir. 2004).  Plaintiffs

16   allege that Defendants made two types of alleged false misrepresentations regarding: (1)

17   Defendants' VQA orders and (2) the Nextel-Sprint merger.  Plaintiffs fail to meet this standard

18   with respect to either type of alleged misrepresentation.

19           **1.     VQA Orders.**

20           Plaintiffs allege that Defendants misrepresented that Ditech had received two orders

21   worth over five million dollars from two new customers in Asia.  (ACAC, ¶ 4(a).)  In a press

22   release issued on August 24, 2004, Ditech announced it had "secured orders to deploy its [VQA]

23   solutions with two new customers in Asia .... totaling in excess of five million dollars."  (*Id*., ¶

24   29.)  On a conference call later that day, Montgomery stated: "Although we don't know yet

25   precisely where Q2 VQA revenues will be, given our Q4 revenues and orders in excess of $5

26   million already in Q2, you can see the beginning of a trend line that gives us real confidence in

27   our VQA business."  (*Id*., ¶ 30.)  Plaintiffs contend these statements were false because the

28   orders were not "secured."  According to Plaintiffs, the new clients had the right to change their

United States District Court

For the Northern District of California

minds about the orders and were not obligated to purchase the services under these orders.  (*Id*.,

¶¶ 4(a), 34.)  However, Plaintiffs merely allege in a conclusory fashion that the customers had a

contractual right to change their mind.  They fail to allege any facts, let alone with facts with

particularity, to support a belief that these customers actually had a contractual right to change

their mind.[2]  *See* 15 U.S.C. § 78u-4(b)(1)(B).  That the customers, in fact, had not purchased the

services under these orders as of the date Plaintiffs filed this Complaint does not provide

support for Plaintiffs' claims, but rather, is merely an example of pleading "fraud by hindsight,"

which is prohibited by the PSLRA.  *See Silicon Graphics*, 183 F.3d at 988.[3]  Thus, the Court

concludes that Plaintiffs fail to sufficiently allege falsity with respect to the alleged

misrepresentations as to the VQA orders.

### 2.    Nextel-Sprint Merger.

Plaintiffs allege that Defendants misrepresented that the then proposed merger between

Sprint and Nextel, which was announced in December 2004, should not be of concern to

investors and would be "quite good" for Ditech.  (ACAC, ¶ 4(b).)  Specifically, Plaintiffs allege

that on February 17, 2005, Montgomery stated on a conference call: "The Nextel-Sprint merger

is actually, we think, quite good for us in that the key strategic people on the technical side are

actually going to be the Nextel players, and this is what we've seen publicly announced.  So we

think that's positive, but we also have an account team calling on Sprint directly in Kansas City,

which we're hopeful the 2 points lead to the right end."  (*Id*., ¶ 42.)  Plaintiffs have not alleged

any material non-public information known by Defendants at the time this statement was made

---

[2] In opposition to Defendants' motion and in support of Plaintiffs' contention that Defendants' representations regarding the VQA orders from the Asian customers were false when made, Plaintiffs point to a statement made by Montgomery during a conference call on November 3, 2004: "I'm happy to say that I don't have a loss report associated with VQA.  I have a delay report that suggests there are other things we need to do to win the business." (Opp. at 9.)  However, this statement was made in response to a question regarding Ditech's *domestic* VQA trials, and thus, does not assist Plaintiffs.  (North Decl., Ex. B.)

[3] Plaintiffs further allege that these statements are false because Defendants "lacked any basis to express 'real confidence' in Ditech's VQA business," (ACAC, ¶ 34(c)), presumably because the orders were not "secured."  This basis for alleging falsity fails for the same reason; Plaintiffs fail to allege any facts which would support drawing an inference that these orders were doubtful or illusory, let alone facts with particularity.  *See* 15 U.S.C. § 78u-4(b)(1)(B).

United States District Court

For the Northern District of California

1    which would have rendered this statement false, such as that the key strategic technical people

2    in the merged company were not going to be from Nextel or that Defendants had other

3    information at that time demonstrating it was likely the merger was going to cause Ditech to

4    lose Nextel's business.  Plaintiffs thus fail to allege any facts, let alone with facts with

5    particularity, to support a belief that the positive statement regarding the merger was false and

6    that Ditech knew it was false at the time it was made.  *See* 15 U.S.C. § 78u-4(b)(1)(B).

7    Accordingly, the Court concludes that Plaintiffs fail to sufficiently allege falsity with respect to

8    the alleged misrepresentations as to the Nextel-Sprint merger.

9    **D.      Plaintiffs fail to Plead Sufficient Facts to Demonstrate Scienter.**

10        The PSLRA also requires a plaintiff to allege particular facts giving rise to a strong

11   inference that "the defendant made false or misleading statements either intentionally or with

12   deliberate recklessness."  *Vantive*, 283 F.3d at 1085; 15 U.S.C. § 78u-4(b)(2).  Where the

13   pleadings are not sufficiently particularized or where, even taken as a whole, they do not raise a

14   strong inference of scienter, dismissal pursuant to Rule 12(b)(6) is proper.  *Lipton v.*

15   *Pathogenesis Corp.*, 284 F.3d 1027, 1038 (9th Cir. 2002).  Moreover, to determine whether a

16   plaintiff has pled a strong inference of scienter, "the court must consider all reasonable

17   inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs."

18   *Gompper*, 298 F.3d at 897.

19        Plaintiffs rely on Montgomery's and Tamblyn's stock sales to support their scienter

20   allegations.  "Although 'unusual' or 'suspicious' stock sales by corporate insiders may

21   constitute circumstantial evidence of scienter, ... insider trading is suspicious only when it is

22   dramatically out of line with prior trading practices at times calculated to maximize the personal

23   benefit from undisclosed inside information."  *Silicon Graphics*, 183 F.3d at 986 (internal

24   quotations and citations omitted).  Thus, courts consider the following factors in determining

25   whether stock sales by inside officers or directors provide sufficient evidence of scienter: "(1)

26   the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3)

27   whether the sales were consistent with the insider's prior trading history."  *Id*.; *see also Ronconi*,

28   253 F.3d at 435.

1    In *Silicon Graphics*, the Ninth Circuit held that selling between 6.9 and 7.7 percent was

2    a relatively small portion and thus not unusual or suspicious. *Silicon Graphics*, 183 F.3d at 987.

3    The court found that the 43.6 percent sold by one senior vice-president of the company did not

4    give rise to a strong inference of deliberate recklessness because: (1) he only sold only 20,000

5    stocks; (2) the amount was only 5 percent of the stocks sales with which the plaintiff was

6    concerned; (3) the senior vice-president had only been with the company for one year and had

7    no significant trading history for purposes of comparison; and (4) the other officers sold

8    relatively insignificant portions of their holdings. *Id*.  The court further held that the 73.3

9    percent sold by another senior vice-president was insufficient to allege scienter based on the

10   circumstances of that case, including that he was forbidden to sell stocks before the class period

11   and he did not make any of the allegedly misleading statements. *Id*. at 987-88.

12   In *Ronconi*, the court held that selling 10 and 17 percent of the insiders' respective stock

13   holdings was not suspicious. *Ronconi*, 253 F.3d at 435 (noting that 10 and 17 percent was "just

14   above the 7.7 percent and 6.9 percent that [the court] held not to be suspicious in *Silicon*

15   *Graphics*").  Even when an officer sold 98 percent of her stock during the class period, the

16   *Ronconi* court found such evidence insufficient to demonstrate scienter because the plaintiffs

17   failed to allege sufficient trading history from which the court could conclude "that her trading

18   was dramatically out of line with prior trading practices" and because the rest of the corporate

19   insiders did not sell significant portions of their stock holdings. *Id*. at 436 (quotations omitted);

20   *see also Copper Mountain*, 311 F. Supp. 2d at 875 (finding sales of between 17 and 21 percent

21   not suspicious enough to raise a strong inference of scienter); *In re FVC.COM Sec. Lit.*, 136 F.

22   Supp. 2d 1031, 1039 (N.D. Cal. 2000) (finding sale of 13.3 percent of defendants' stocks was

23   "not suspicious and in fact suggests that defendants were not aware at the time of their stock

24   sales that the ... press releases contained false information").

25   During the Class Period, Montgomery sold 225,000 shares, at a rate of 25,000 every two

26   weeks, for a total price of $4,491,900, which was 12.7 percent of his stock holdings at that time.

27   (ACAC, ¶ 58; North Decl., Ex. O.)  During the previous four months, Montgomery sold

28   320,000 shares, at a rate of 25,000 approximately every two weeks, plus an additional 120,000

**United States District Court**

For the Northern District of California

1   shares in late June 2004, for a total of $6,715,917. (North Decl., Ex. I.) During the Class

2   Period, Tamblyn sold 25,000 shares for a total price of $614,142, which was 3.1 percent of his

3   stock holdings at that time. (ACAC, ¶ 58.; North Decl., Ex. O.)[4] Considered together, the stock

4   sales by Montgomery and Tamblyn amounted to 9.7 percent of their combined holdings during

5   the Class Period. (*Id*.) Their stock sales during the Class Period amounted to 7.1 percent of the

6   total holdings by the insiders identified in the Complaint, and less than 5.8 percent of the total

7   holdings by all Ditech directors and executive officers as a group. (North Decl., Ex. O.)

8          The relatively low percentage of stocks sold by Montgomery and Tamblyn during the

9   Class Period is not suspicious enough to raise a strong inference of scienter. *See Ronconi*, 253

10  F.3d at 435; *Silicon Graphics*, 183 F.3d at 987; *Copper Mountain*, 311 F. Supp. 2d at 875;

11  *FVC.COM*, 136 F. Supp. 2d at.1039. Moreover, given that Montgomery sold more stocks

12  during the four months preceding the Class Period, his sales during the Class Period were not

13  "dramatically out of line with prior trading practices." *See Vantive*, 283 F.3d at 1092 (holding

14  that where defendants' stock sales in the preceding seven months exceeded the sales during the

15  class period, their stock sales were "hardly ... dramatically out of line with prior trading

16  practices").

17         Finally, the fact that the Complaint fails to allege that the remaining corporate insiders

18  sold a large portion of their Ditech stocks further defeats any inference of scienter. *See Ronconi*,

19  253 F.3d at 436 ("One insider's well timed sales do not support the 'strong inference' required

20  ... where the rest of the equally knowledgeable insiders act in a way inconsistent with the

21  inference that the favorable characterizations of the company's affairs were known to be false

22  when made.").[5]

23

24         [4] Notably, neither Montgomery nor Tamblyn sold any Ditech stocks during the Class
    Period *after* the allegedly false statement regarding the Nextel-Sprint merger was made on
25  February 17, 2005.

26         [5] Plaintiffs' reliance on *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380
    F.3d 1226, 1232 (9th Cir. 2004) and *In re Qwest Communications Int'l Sec. Lit.*, 396 F.
27  Supp. 2d 1178, 1196 (D. Colo. 2004) to support their showing of scienter is misplaced. In
    *Nursing Home*, the chief executive officer sold more than 29 million shares for almost $900
28  million in less than ten days, which amounted to only 2.1 percent of his holdings. The court
    noted that this stock sale presented a "novel situation: few others could sell $900 million

**United States District Court**

For the Northern District of California

1

**CONCLUSION**

2    For the foregoing reasons, the Court GRANTS Defendants' motion to dismiss.   This

3    ruling is without prejudice to Plaintiff filing an amended complaint.  Plaintiffs shall file any

4    amended complaint within thirty days of the date of this Order.   If Plaintiffs do not file an

5    amended complaint within thirty days, this case shall be dismissed.  If an amended complaint is

6    filed, Defendants shall either file an answer or move to dismiss within twenty days of service of

7    the amended complaint.

8        **IT IS SO ORDERED.**

9

10   Dated: August 10, 2006

_____
JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE

11

12

13

14

15

16

17

18

19

20

21

---

22   worth of stock and only sell 2.1% of their holdings." *Nursing Home*, 380 F.3d at 1232.
Thus, the court held that "where stock sales result in a truly *astronomical* figure, less weight
23   should be given to the fact that they may represent a small portion of the defendant's
holdings. *Id.* (emphasis added).  Moreover, the court found it significant that the officer had
24   not sold any shares in the previous five years. *Id.*  Here, the $4.5 million Montgomery sold in
stock does not compare to the $900 million the court found astronomical.  Nor were
25   Montgomery's Class Period sales highly inconsistent with his prior trading history
considering that he sold $6.7 million in stock in the four months before the Class Period
26   began.
    *In Qwest Communications*, the court concluded that the inference which could be
27   reasonably drawn from an officer selling seven percent of her stocks for $410,000 in one day
was "fairly weak." *Qwest Communications*, 396 F. Supp. 2d at 1196.  It was the sales from
28   the remaining corporate defendants, which included sales worth over $200 million and $1.5
billion, that the court found supported a strong inference of scienter. *Id.*

13