IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

In re DITECH COMMUNICATIONS CORP.
SECURITIES LITIGATION

No. C 05-02406 JSW

This Document Relates To:

ALL ACTIONS.

**ORDER GRANTING MOTION TO DISMISS SECOND AMENDED COMPLAINT WITHOUT PREJUDICE**

Now before the Court is the motion to dismiss the Second Amended Class Action Complaint ("SCAC" or "Complaint") filed by defendants Ditech Communications Corporation, which subsequently changed its name to Ditech Networks, Inc., ("Ditech"), Timothy K. Montgomery ("Montgomery"), and William J. Tamblyn ("Tamblyn") (collectively "Defendants"). Defendants move to dismiss asserting that lead plaintiffs Jack Casey, Tonio Dahmen, George Innocenti, Shengli Duan and Norbert P. Czub (collectively "Plaintiffs") fail to meet the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"). Defendants further assert that allowing amendments to the Complaint would be futile and request that the Court dismiss this action with prejudice. Having carefully reviewed the parties' papers, considered their arguments and relevant legal authority, and having had the benefit of oral argument, the Court hereby GRANTS Defendants' motion to dismiss with leave to amend.

**FACTUAL BACKGROUND**

On August 10, 2006, the Court granted Defendants' motion to dismiss Plaintiffs' Amended Class Action Complaint ("ACAC") and dismissed Plaintiffs' claims brought under

Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, with leave to amend. The Court held that Plaintiffs failed to sufficiently allege materially false or misleading statements made by Defendants and that Plaintiffs failed to sufficiently allege scienter. In an attempt to address these pleading deficiencies, Plaintiffs filed a SCAC. Defendants now move to dismiss Plaintiffs' SCAC.

The allegations from the Plaintiffs' ACAC are extensively detailed in the Court's order dated August 10, 2006, on Defendant's first motion to dismiss and need not be reiterated here. Accordingly, the Court will focus on the allegations added in the SCAC and determine whether, based on such additional allegations, Plaintiffs sufficiently allege any materially false or misleading statements and scienter.

## **Voice Quality Assurance Orders**

Plaintiffs allege that on August 24, 2004, Defendants represented that they secured two orders totaling over five million dollars for Voice Quality Assurance ("VQA") from new customers in Asia. (SCAC, ¶¶ 4(a), 31-32.) Plaintiffs allege that the orders were not actually "secured" either because the orders were only "trials" or agreements to "evaluate" the product or because Ditech was seriously deficient in numerous shipping requirements which would prevent any shipments to China. (*Id.*, ¶ 4(a).) Plaintiffs further allege that the statements regarding the VQA orders were false because the orders "were invalidated shortly after [D]efendants' announcement when the company from whom Ditech purportedly 'secured' the order was bought out by another company and/or reorganized, resulting in the expiration of the original company's 'letter of credit'– a prerequisite for acceptance of international orders in China." (*Id.*)

As support for such allegations, Plaintiffs rely on information they obtained from a Confidential Witness 1, who worked at Ditech as a stockroom supervisor from prior to the Class Period until early 2005. Confidential Witness 1's responsibilities at Ditech included "reviewing import/export regulations and documentation used by Ditech." (*Id.*, ¶ 23(a).) More specifically, he "was involved in reviewing the international shipping documentation that

2

Ditech had prepared and/or needed to ship VQA products to China." (*Id*.) According to Confidential Witness 1, Ditech's shipping procedures and documentation were outdated. (*Id*., ¶ 37.) Ditech, thus, was unable to comply with international shipping regulations for shipping to China and could not ship the VQA orders. (*Id*.) Several weeks before alleged misrepresentations were made on August 24, 2004, Confidential Witness 1 found the following problems with the shipping documents he reviewed: (1) the "commodity classification" determined by government regulations, and needed to clear customs, did not match the product being shipped; (2) the documents did not contain the then-current government regulations; (3) China was wrongfully listed as an "embargoed country"; and (4) some of the documentation was dated 2002. (*Id*.) In mid-August 2004, Confidential Witness 1 advised Tamblyn of the deficiencies he observed on the forms and that such deficiencies would have to be corrected before the VQA product could be shipped to China. (*Id*.) According to Confidential Witness 1, Tamblyn did not take any action on this issue for several weeks. (*Id*.)

Plaintiffs further allege that Ditech announced on November 3, 2004, that these orders had not yet shipped, but "maintained that this was merely a 'delay' and that they still expected the orders to ship." (*Id*., ¶¶ 5, 38, 39.) Defendants further announced on that day that the delay was due to management changes within the largest of the two new customers from China, but that the customer had reconfirmed the new shipping schedule and that Ditech was "taking steps to ensure smooth delivery of these orders in the second half of this fiscal year." (*Id*., ¶ 39.)

The statements made on November 3 were false, according to Plaintiffs, because of the problems with Ditech's shipping documents and because one of the two new Chinese customers was "bought out by another company and/or reorganized shortly after the August 24 announcement, resulting in the expiration of the first company's 'letter of credit' - a prerequisite for the acceptance of international orders in China." (*Id*., ¶ 40.) Plaintiffs' allege that when this Chinese company was "bought out by another company and/or reorganized," its VQA order was effectively cancelled. (*Id*., ¶ 43.) According to Confidential Witness 1, at several quarterly meetings he attended, along with Montgomery and Tamblyn, it was revealed that the letter of credit from the first company expired when the company was bought out and/or reorganized,

and that Ditech was never able to secure a letter of credit from the second company. (*Id*., ¶ 44.) Plaintiffs further allege based on information obtained from Witness 1 that an unspecified "manager who dealt directly with the inventory that was purportedly intended for China" attended meetings every three months, which Tamblyn and Montgomery also attended, at which information about the Chinese company "folding" was released. (*Id*.) The same unspecified manager "often" made statements to the effect that the inventory to China "is not going to ship" and "we will find out why at the next meeting." (*Id*., ¶ 44.)

Confidential Witness 1 further reported that a consultant, Jim Smalts, who was the manager of the Customer Service Group during the Class Period, "cautioned throughout the second half of 2004 that the order would not ship to China" and stated to Confidential Witness 1 that he "did not see shipments to China happening anytime soon." (*Id*., ¶ 45.) According to Confidential Witness 1, several other unspecified managers, including one who received direction from an officer who reported to Montgomery or Tamblyn during the Class period, confirmed internally that the VQA orders "were not going to ship" during the Class Period. (*Id*.)

**Nextel-Sprint Merger**

On a conference call on February 17, 2005, Montgomery stated: "The Nextel-Sprint merger is actually, we think, quite good for us in that the key strategic people on the technical side are actually going to be the Nextel players, and this is what we've seen publicly announced. So we think that's positive, but we also have an account team calling on Sprint directly in Kansas City, which we're hopeful the 2 points lead to the right end." (*Id*., ¶ 49; *see also* ¶ 4(b).) According to Plaintiffs, this representation was false and misleading when made because the merger posed a serious threat to Ditech and Defendants "were aware that their business would be materially impacted at least two months before they finally disclosed this fact to the public." (*Id*., ¶ 50.) To support their allegation of falsity, Plaintiffs rely on information obtained by confidential witnesses who worked at companies that installed Nextel orders of Ditech's echo cancellation equipment. Plaintiffs point to emails from theses third-

4

1  party companies dated in mid-March and early April 2005 showing that the Nextel orders of
2  Ditech's echo cancellation equipment referred to them had dropped significantly.  (*Id*., ¶ 51.)
3     Confidential witnesses 2 through 6 are current and former employees of Scope
4  Networks, a company that installed approximately half of Nextel's orders of Ditech's echo
5  cancellation equipment.  (*Id*., ¶¶ 23(b)-(e), 55.)  Confidential Witness 2 was employed by Scope
6  Networks as a project technician from early 2005 until after the Class Period.  (*Id*., ¶ 23(b).)
7  Confidential Witness 3 was a field technician with Scope Networks throughout the Class
8  Period.  (*Id*., ¶ 23(c).)  Confidential Witness 4 worked for Scope Networks as a project manager
9  for several years, including through out the Class Period.  (*Id*., ¶ 23(d).)  Confidential Witness 5
10 worked as a field technician for Scope Networks throughout the Class Period.  (*Id*., ¶ 23(e).)
11 Throughout the Class Period, Confidential Witness 6 worked as an installation supervisor for
12 Pride Communications, "a company that performed installation work for Nextel that included
13 installation of Ditech echo cancellation devices."  (*Id*., ¶ 23(f).)  All of these confidential
14 witnesses installed Ditech equipment for Nextel.  (*Id*., ¶¶ 23(b)-(f).)
15    Plaintiffs allege that according to Confidential Witnesses 2 through 5, the number of
16 Ditech installations for Nextel "declined dramatically following the announcement of the
17 Nextel-Sprint merger," and according to Confidential Witnesses 3 and 4, the installations
18 "ultimately 'dropped off completely' as a result of the merger."  (*Id*., ¶ 56.)  According to
19 Confidential Witnesses 3, "it was common knowledge at Scope that once Nextel merged with
20 Sprint, 'everything would stop for at least a year,' until the newly merged Sprint-Nextel was
21 'reorganized.'"  (*Id*.)  Confidential Witness 6 confirmed that Pride Communications'
22 installations of Ditech equipment for Nextel similarly declined after the announcement of the
23 merger.  (*Id*., ¶ 60.)
24    On May 26, 2005, the "truth" about the Nextel-Sprint merger was revealed when Ditech
25 announced that orders from Nextel dropped almost 60% as a result of the merger.  (*Id*., ¶¶ 6,
26 51.)

**Scienter Allegations**

As in their prior complaint, the allegations of scienter in the SCAC focus solely on stock sales by insiders. (*Id*., ¶¶ 73-79.) With the exception of some additional argument as to what meaning should be attributed to such stock sales, the SCAC does not provide any more information regarding the amount and timing of stock sales by Montgomery or Tamblyn, or any other insider, during the Class Period.

**ANALYSIS**

Plaintiffs allege that throughout the Class Period Defendants publicly made misrepresentations concerning VQA orders and the Sprint-Nextel merger between August 24, 2004 and May 26, 2005 (the "Class Period").[1] Section 10(b) of the Securities Exchange Act provides, in part, that it is unlawful "to use or employ in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b).

Rule 10b-5 makes it unlawful for any person to use interstate commerce:

(a) To employ any device, scheme, or artifice to defraud;
(b) To make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or;
(c) To engage in any act, practice, or course of business that operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To plead a claim under section 10(b) and Rule 10b-5, a plaintiff must allege (1) a misrepresentation or omission, (2) of material fact, (3) made with scienter, (4) on which the plaintiff justifiably relied, (5) that proximately caused the alleged loss. *Binder v. Gillespie*, 184 F.3d 1059, 1063 (9th Cir. 1999). Additionally, as in all actions alleging fraud, a plaintiff must state with particularity the circumstances constituting fraud. *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 193 (9th Cir. 1999); Fed. R. Civ. P. 9(b).

---

[1] The Court has not yet certified a class and refers to the time period involved as the "Class Period" for ease of reference.

6

Plaintiffs also claim that individual defendants are liable pursuant to Section 20(a) of the Securities Exchange Act, which provides for derivative liability for those who control others found to be primarily liable under the provisions of that act. *See In re Ramp Networks, Inc. Sec. Lit.*, 201 F. Supp. 2d 1051, 1063 (N.D. Cal. 2002). Where a plaintiff asserts a Section 20(a) claim based on an underlying violation of section 10(b), the pleading requirements for both violations are the same. *Id.*

**A.     Applicable Pleading Standards: Private Securities Litigation Reform Act.**

In order to limit the number of frivolous private securities lawsuits, Congress enacted the PSLRA in December of 1995, and created heightened pleading standards for such lawsuits. 15 U.S.C. § 78u-4(b). The PSLRA requires that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B). Furthermore, the PSLRA requires that the plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

The heightened standard set by the PSLRA was intended to put an end to securities fraud lawsuits that plead "fraud by hindsight." *In re Silicon Graphics, Inc. Sec. Lit.*, 183 F.3d 970, 988 (9th Cir. 1999). "The PSLRA significantly altered pleading requirements in private securities fraud litigation by requiring that a complaint plead with particularity both falsity *and* scienter." *In re Vantive Corp. Sec. Lit.*, 283 F.3d 1079, 1084 (9th Cir. 2002) (citing *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001)) (emphasis added). "Thus the complaint must allege that the defendant made false or misleading statements either intentionally or with deliberate recklessness or, if the challenged representation is a forward looking statement, with 'actual knowledge . . . that the statement was false or misleading.'" *Id.* at 1085 (citing 15 U.S.C. § 78u-5(c)(1)(B)(I)). This is often accomplished "by pointing to inconsistent contemporaneous statements or information (such as internal reports) made by or available to the defendants." *Yourish v. California Amplifier*, 191 F.3d 983, 993 (9th Cir. 1999) (quoting *In re GlenFed Sec.*

7

*Lit.*, 42 F.3d 1541, 1549 (9th Cir. 1991) (*en banc*)); *see also id.* at 994 (discussing insufficiency of plaintiffs' allegations with regard to the non-disclosure of confidential non-public information).

Under the PSLRA, a complaint still is construed in the light most favorable to the non-moving party and all material allegations in the complaint are taken to be true. *Silicon Graphics*, 183 F.3d at 983. To determine whether a plaintiff has pled a strong inference of scienter, however, "the court must consider all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002). The Court "should consider all the allegations in their entirety, together with any reasonable inferences therefrom, in concluding whether, on balance, the plaintiffs' complaint gives rise to the requisite inference of scienter." *Id.* "Conclusory allegations of law and unwarranted inferences, however, are insufficient to defeat a motion to dismiss." *In re Northpoint Communications Group, Inc. Sec. Lit.* (*Northpoint II*), 221 F. Supp. 2d 1090, 1094 (N.D. Cal. 2002).

Finally, the Court may consider the facts alleged in the complaint, documents attached to the complaint, documents relied upon but not attached to the complaint when the authenticity of those documents is not questioned, and other matters for which the Court can take judicial notice. *Northpoint II*, 221 F. Supp. 2d at 1094; *see also Silicon Graphics*, 183 F.3d at 986.

**B.      Request for Judicial Notice.**

Defendants request that the Court take judicial notice of Ditech's press releases, SEC filings, transcripts of Ditech's conference calls, and a transcript of a previous hearing before this Court, all of which are referenced in the Complaint, are publicly filed documents, or are otherwise the proper subject of judicial notice. Plaintiffs do not dispute the accuracy of the documents attached to the request, and the requested documents are the types of documents of which this Court properly may take judicial notice. *See, e.g., In re Calpine Corp. Sec. Lit.*, 288 F. Supp. 2d 1054, 1076 (N.D. Cal. 2003) (court "may properly take judicial notice of SEC filings and documents expressly referenced" in a complaint"); *see also Plevy v. Haggerty*, 38 F. Supp. 2d 816, 821 (C.D. Cal. 1998). Accordingly, the Court GRANTS Defendants' requests.

8

**C.      Plaintiffs Fail To Plead Sufficient Facts to Demonstrate Falsity.**

The PSLRA requires that Plaintiffs allege with the requisite particularity each statement alleged to be false or misleading, the reason or reasons why the statement was false or misleading, and if those allegations are made on information and belief, all facts on which that belief is formed. *See* 15 U.S.C. § 78u-4(b)(1)(B); *see also Employers Teamsters Local Nos. 175 and 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1134 (9th Cir. 2004). Plaintiffs allege that Defendants made two types of alleged false misrepresentations regarding: (1) Defendants' VQA orders and (2) the Nextel-Sprint merger. Plaintiffs fail to meet this standard with respect to either type of alleged misrepresentation.

**1.      VQA Orders.**

Plaintiffs allege that Defendants misrepresented that Ditech had received two orders worth over five million dollars from two new customers in Asia. (ACAC, ¶ 4(a).) In a press release issued on August 24, 2004, Ditech announced it had "secured orders to deploy its [VQA] solutions with two new customers in Asia .... totaling in excess of five million dollars." (*Id*., ¶ 29.) On a conference call later that day, Montgomery stated: "Although we don't know yet precisely where Q2 VQA revenues will be, given our Q4 revenues and orders in excess of $5 million already in Q2, you can see the beginning of a trend line that gives us real confidence in our VQA business." (*Id*., ¶ 30.) On November 3, 2004, Ditech announced that these orders had not yet shipped, but "maintained that this was merely a 'delay' and that they still expected the orders to ship." (*Id*., ¶¶ 5, 38, 39.) Defendants further announced on that day that the delay was due to management changes within the largest of the two new customers from China, but that the customer had reconfirmed the new shipping schedule and that Ditech was "taking steps to ensure smooth delivery of these orders in the second half of this fiscal year." (*Id*., ¶ 39.)

In their ACAC, Plaintiffs alleged that these above statements were false because the new clients had the right to change their minds about the orders and were not obligated to purchase the services under these orders. However, in the Order dated August 10, 2006, the Court found that Plaintiffs failed to allege any facts, let alone facts with particularity, to support a belief that these customers actually had a contractual right to change their mind. In their SCAC, Plaintiffs

9

1  deleted all allegations supporting their original theory and raise a new theory to support their
2  position that Defendants' statement regarding the VQA orders were false when made.  Plaintiffs
3  now allege that the orders were not actually "secured" either because Ditech was seriously
4  deficient in numerous shipping requirements which would prevent any shipments to China or
5  because the shortly after the orders were announced, one of the Asian customers was bought out
6  by another company and/or reorganized, resulting in the expiration of the original company's
7  'letter of credit'– a prerequisite for acceptance of international orders in China."  (SCAC, ¶
8  4(a).)[2]

9  Plaintiffs' sole support for their position that Defendants' statements regarding the VQA
10 orders were false when made is information they obtained from Confidential Witness 1.  Upon
11 review of the information provided by Confidential Witness 1 alleged in the SCAC, the Court
12 finds it insufficient to demonstrate a basis for believing Defendants' statements regarding the
13 VQA orders were false when made.  Confidential Witness 1 said he noticed several problems
14 with the shipping documents several weeks before the statements were made on August 24,
15 2004 and that in mid-August of that he year he advised Tamblyn of the deficiencies and of their
16 need to correct them before the VQA product could be shipped to China.  (SCAC, ¶ 37.)
17 According to Confidential Witness 1, Tamblyn waited several weeks to take any action on this
18 issue.  (*Id*.)  Notably, Plaintiffs do not allege any facts which would demonstrate the alleged
19 deficiencies would be difficult or time consuming to fix.  Nor do Plaintiffs allege what action
20 Tamblyn did take or, more importantly, what additional actions would have been necessary to
21 correct the deficiencies before the VQA product could be shipped internationally.[3]

---

[2]  In paragraph 4(a), Plaintiffs also allege that the orders were not actually "secured" because the orders were only "trials" or agreements to "evaluate" the product.  However, Plaintiffs fail to provide *any* further allegations, or even argument, to support a belief that the orders were only trials or agreements to evaluate the product.

[3]  On December 14, 2006, after the Court issued an order vacating the hearing on the pending motion to dismiss, Plaintiffs filed a "Supplemental Submission" without obtaining prior Court approval in violation of Civil Local 7-3(d).  Plaintiffs contend that they have discovered additional facts that support their complaint.  Because such facts are not yet alleged in the complaint, the Court will not consider them in ruling on the motion to dismiss.  However, to provide Plaintiffs guidance in the event they elect to file another amended the Complaint, the Court notes that Plaintiffs' supplemental submission does not provide

United States District Court
For the Northern District of California

The allegations with respect to the alleged expiration of the letter of credit are similarly deficient. Plaintiffs allege that Confidential Witness 1 learned at quarterly meetings attended by Montgomery and Tamblyn that the letter of credit from the first company expired when the company was bought out and/or reorganized and that Ditech was never able to secure a letter of credit from the second company. (*Id.*, ¶¶ 43-45.) However, Plaintiffs do not allege when this information was conveyed to Montgomery and Tamblyn, who conveyed it, or the substance of what was allegedly conveyed. Although Plaintiffs allege that, according to Confidential Witness 1, managers stated that the VQA orders were not going to ship, Plaintiffs fail to allege who the managers were, how or when they obtained such knowledge, or exactly what they knew. (*Id.*, ¶¶ 44-45.) For example, it is not clear whether they said the VQA products would not ship on a particular date or that they would never be shipped. Therefore, the Court finds that Plaintiffs allegations thus are insufficient to support a belief that, when the alleged statements were made, Defendants knew that the letter of credit from the original customer had expired and that Ditech knew it could not receive a new one from the new or reorganized company. *See* 15 U.S.C. § 78u-4(b)(1)(B). Accordingly, the Court concludes that Plaintiffs fail to sufficiently allege falsity with respect to the alleged misrepresentations as to the VQA orders.

**2.    Nextel-Sprint Merger.**

Plaintiff contends that Defendants' positive statements regarding proposed merger between Sprint and Nextel made in mid-February 2005 were false and misleading. To support their contention that Defendants knew, when the statements were made, that they were false, Plaintiffs rely on statements from confidential witnesses who worked at companies that

---

sufficient information, if it were alleged in their complaint, to demonstrate falsity or scienter. Plaintiffs argue that Defendants knew of the deficiencies with their shipping documents and that it would take at minimum several months to correct the problems, with no guarantee as to how long it would take. Plaintiffs do not provide any basis for demonstrating Defendants had such knowledge. Moreover, even if Plaintiffs could allege facts which would show Defendants were aware of the deficiencies and the length of time it would take to cure them, it is not clear how such knowledge would render the statements regarding the VQA orders false. The alleged misrepresentations Plaintiffs point to merely state that VQA orders were secured, not that the orders were promised to be shipped by a certain date or that the orders were time sensitive.

11

installed Nextel's orders of Ditech's echo cancellation equipment.  At most, the allegations provide anecdotal information that the third-party witnesses observed that the numbers of orders declined starting in March 2005, or perhaps when the merger was announced in December 2004.  (SCAC, ¶¶ 51, 56-60.)  Plaintiffs do not allege any facts to support a belief that such declines observed by the confidential witnesses were permanent, or more significantly, that Defendants *knew as of mid-February* that it would lose Nextel's business as a result of the merger.  Again, Plaintiffs failed to allege any material non-public information known by Defendants at the time the statement was made which would have rendered it false.  *See* 15 U.S.C. § 78u-4(b)(1)(B).  Accordingly, the Court concludes that Plaintiffs fail to sufficiently allege falsity with respect to the alleged misrepresentations as to the Nextel-Sprint merger.

**D.	Plaintiffs fail to Plead Sufficient Facts to Demonstrate Scienter.**

The PSLRA also requires a plaintiff to allege particular facts giving rise to a strong inference that "the defendant made false or misleading statements either intentionally or with deliberate recklessness." *Vantive*, 283 F.3d at 1085; 15 U.S.C. § 78u-4(b)(2).  Where the pleadings are not sufficiently particularized or where, even taken as a whole, they do not raise a strong inference of scienter, dismissal pursuant to Rule 12(b)(6) is proper. *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1038 (9th Cir. 2002).  Moreover, to determine whether a plaintiff has pled a strong inference of scienter, "the court must consider all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." *Gompper*, 298 F.3d at 897.

In their ACAC, Plaintiffs relied on Montgomery's and Tamblyn's stock sales to support their scienter allegations.  In the Order dated August 10, 2006, the Court found that the relatively low percentage of stocks sold by Montgomery and Tamblyn during the Class Period were not suspicious enough to raise a strong inference of scienter.  Additionally, given that Montgomery sold more stocks during the four months preceding the Class Period, his sales during the Class Period were not dramatically out of line with prior trading practices.  The Court also noted that the absence of allegations that the remaining corporate insiders sold a large portion of their Ditech stocks further defeated any inference of scienter.  In light of fact

that Plaintiffs have not alleged *any* additional facts regarding stock sales by Montgomery, Tamblyn, or other insiders, or any other facts to support an inference of scienter, the Court finds that Plaintiffs' allegations fail to raise a strong inference of scienter for the same reasons provided in the Order dated August 10, 2006.

### CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' motion to dismiss. This ruling is without prejudice to Plaintiffs filing an amended complaint. Plaintiffs are advised that the Court is not inclined to provide any additional opportunities to amend. If Plaintiffs file an amended complaint which does not provide a sufficient basis to support their position that Defendants made false and misleading statements and did so with scienter, the Court will likely determine that Plaintiffs are not aware of any additional facts which could cure such defects. Plaintiffs shall file any amended complaint within thirty days of the date of this Order. If Plaintiffs do not file an amended complaint within thirty days, this case shall be dismissed. If an amended complaint is filed, Defendants shall either file an answer or move to dismiss within twenty days of service of the amended complaint.

**IT IS SO ORDERED.**

Dated: March 22, 2006

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE

13