IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re DITECH COMMUNICATIONS CORP. SECURITIES LITIGATION | No. C 05-02406 JSW |
| This Document Relates To:<br><br>ALL ACTIONS.<br>_____/ | **ORDER GRANTING MOTION TO DISMISS THIRD AMENDED COMPLAINT WITH PREJUDICE** |

Now before the Court is the motion to dismiss the Third Amended Class Action Complaint ("TCAC" or "Complaint") filed by defendants Ditech Communications Corporation, which subsequently changed its name to Ditech Networks, Inc., ("Ditech"), Timothy K. Montgomery ("Montgomery"), and William J. Tamblyn ("Tamblyn") (collectively "Defendants"). Defendants move to dismiss asserting that lead plaintiffs Jack Casey, Tonio Dahmen, George Innocenti, Shengli Duan and Norbert P. Czub (collectively "Plaintiffs") fail to meet the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"). Defendants further assert that allowing amendments to the Complaint would be futile and request that the Court dismiss this action with prejudice. Having carefully reviewed the parties' papers, considered their arguments and relevant legal authority, and having had the benefit of oral argument, the Court hereby GRANTS Defendants' motion to dismiss without leave to amend.

**FACTUAL BACKGROUND**

On August 10, 2006, the Court granted Defendants' motion to dismiss Plaintiffs' Amended Class Action Complaint ("ACAC") and dismissed Plaintiffs' claims brought under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, with leave to amend. The Court held that Plaintiffs failed to sufficiently allege materially false or misleading statements made by Defendants and that Plaintiffs failed to sufficiently allege scienter. In an attempt to address these pleading deficiencies, Plaintiffs filed a Second Amended Class Action Complaint ("SCAC"). On March 22, 2007, the Court found the allegations in the SCAC deficient as well. The Court gave Plaintiffs one last opportunity to amend. Plaintiff's filed a TCAC. Defendants now move to dismiss Plaintiffs' TCAC.

The allegations from the Plaintiffs' prior complaints are extensively detailed in the Court's orders dated August 10, 2006 and March 22, 2007 regarding Defendants' previous motions to dismiss and need not be reiterated here. Accordingly, the Court will focus on the allegations added in the TCAC and determine whether, based on such additional allegations, Plaintiffs sufficiently allege any materially false or misleading statements and scienter.

**Voice Quality Assurance Orders**

Plaintiffs allege that on August 24, 2004, Defendants represented that they secured two orders totaling over five million dollars for Voice Quality Assurance ("VQA") from new customers in Asia. (TCAC, ¶¶ 4(a), 31-32.) Plaintiffs allege that the orders were not actually "secured" because (1) "Ditech knew that it could not timely comply with the numerous government regulations and requirement concerning international trade, and that its non-compliance precluded shipping its products to China; (2) "the purported 'orders' were invalidated shortly after defendants' announcement, when the company from whom Ditech purportedly 'secured' the 'orders' was bought out by another company and/or reorganized, resulting in the expiration of the original company's 'letter of credit' – a prerequisite to the consummation of Ditech's international orders;" and (3) after the letter of credit expired, "Ditech knew that the purported customer in Asia treated its relationship with Ditech as a mere

opportunity to 'evaluate' Ditech's VQA technology as a potential alternative to its normal supplier, Tellabs." (*Id*., ¶ 4(a).)

As support for such allegations in its SCAC, Plaintiffs relied on information they obtained from a Confidential Witness 1, who worked at Ditech as a stockroom supervisor from prior to the Class Period until early 2005. Confidential Witness 1's responsibilities at Ditech included "reviewing import/export regulations and documentation used by Ditech." (SCAC, ¶ 23(a).) More specifically, he "was involved in reviewing the international shipping documentation that Ditech had prepared and/or needed to ship VQA products to China." (*Id*.) According to Confidential Witness 1, Ditech's shipping procedures and documentation were outdated. (*Id*., ¶ 37.) Ditech, thus, was unable to comply with international shipping regulations for shipping to China and could not ship the VQA orders. (*Id*.) Several weeks before alleged misrepresentations were made on August 24, 2004, Confidential Witness 1 found the following problems with the shipping documents he reviewed: (1) the "commodity classification" determined by government regulations, and needed to clear customs, did not match the product being shipped; (2) the documents did not contain the then-current government regulations; (3) China was wrongfully listed as an "embargoed country"; and (4) some of the documentation was dated 2002. (*Id*.) In mid-August 2004, Confidential Witness 1 advised Tamblyn of the deficiencies he observed on the forms and that such deficiencies would have to be corrected before the VQA product could be shipped to China. (*Id*.) According to Confidential Witness 1, Tamblyn did not take any action on this issue for several weeks. (*Id*.)

Plaintiffs further alleged that Ditech announced on November 3, 2004, that these orders had not yet shipped, but "maintained that this was merely a 'delay' and that they still expected the orders to ship." (*Id*., ¶¶ 5, 38, 39.) Defendants further announced on that day that the delay was due to management changes within the largest of the two new customers from China, but that the customer had reconfirmed the new shipping schedule and that Ditech was "taking steps to ensure smooth delivery of these orders in the second half of this fiscal year." (*Id*., ¶ 39.)

The statements made on November 3 were false, according to Plaintiffs, because of the problems with Ditech's shipping documents and because one of the two new Chinese customers

1  was "bought out by another company and/or reorganized shortly after the August 24
2  announcement, resulting in the expiration of the first company's 'letter of credit' - a prerequisite
3  for the acceptance of international orders in China." (*Id*., ¶ 40.) Plaintiffs' alleged that when
4  this Chinese company was "bought out by another company and/or reorganized," its VQA order
5  was effectively cancelled. (*Id*., ¶ 43.) According to Confidential Witness 1, at several quarterly
6  meetings he attended, along with Montgomery and Tamblyn, it was revealed that the letter of
7  credit from the first company expired when the company was bought out and/or reorganized,
8  and that Ditech was never able to secure a letter of credit from the second company. (*Id*., ¶ 44.)
9  Plaintiffs further alleged based on information obtained from Witness 1 that an unspecified
10 "manager who dealt directly with the inventory that was purportedly intended for China"
11 attended meetings every three months, which Tamblyn and Montgomery also attended, at which
12 information about the Chinese company "folding" was released. (*Id*.) The same unspecified
13 manager "often" made statements to the effect that the inventory to China "is not going to ship"
14 and "we will find out why at the next meeting." (*Id*., ¶ 44.)

15      Confidential Witness 1 further reported that a consultant, Jim Smalts, who was the
16 manager of the Customer Service Group during the Class Period, "cautioned throughout the
17 second half of 2004 that the order would not ship to China" and stated to Confidential Witness 1
18 that he "did not see shipments to China happening anytime soon." (*Id*., ¶ 45.) According to
19 Confidential Witness 1, several other unspecified managers, including one who received
20 direction from an officer who reported to Montgomery or Tamblyn during the Class period,
21 confirmed internally that the VQA orders "were not going to ship" during the Class Period.
22 (*Id*.) In their TCAC, Plaintiffs named one of these managers as Denis Martin, the Senior
23 Director of Manufacturing Operations, who reported directly to Ditech's Chief Operation
24 Officer. (TCAC, ¶ 49.)

25      In their TCAC, Plaintiffs also add allegations from another source, Confidential Witness
26 7, who worked as a Product Verification Engineer for Ditech beginning shortly after the start of
27 the Class Period. (TCAC, ¶ 23(g).) Confidential Witness 7 saw boxes, supposedly bound for
28 China, piled up in a warehouse in Mountain View long into 2005. (*Id*., ¶ 39.) Confidential

1  Witness 7 learned from conversations with Ditech's Sales Engineer Sateesh Hiremagular, that
2  during the "relevant period," Hiremagular made presentations to one of the customers in China
3  during which he hoped to obtain orders for Ditech's VQA orders. (*Id.*, ¶ 43.) Tellabs was also
4  seeking to get this company's business, and Ditech and Tellabs competed for orders of VQA
5  products from this company well into 2005. (*Id.*)

6  Finally, Plaintiffs added allegations regarding the requirements of doing business
7  internationally. Plaintiffs allege that several bodies of law impact the ability of companies
8  located within the United States to do business with companies in China, including Export
9  Administration Regulations ("EAR"). (*Id.*, ¶ 38.) Complying with EAR is a forbidding task.
10 EAR contains a twenty-nine part "steps overview." (*Id.*) Ditech had to navigate these export
11 procedures in connection with past orders and thus is aware that compliance efforts can take
12 months and that there is no guarantee that a company will be able to ship internationally. (*Id.*)
13 For prior orders, Ditech's compliance with export regulations was handled by outside
14 consulting organizations, such as PricewaterhouseCoopers. For the orders to the new Asian
15 customers, Defendants assigned this task to Confidential Witness 1 weeks before the August 24,
16 2004 announcement. (*Id.*)

### Nextel-Sprint Merger

18 On a conference call on February 17, 2005, Montgomery stated: "The Nextel-Sprint
19 merger is actually, we think, quite good for us in that the key strategic people on the technical
20 side are actually going to be the Nextel players, and this is what we've seen publicly
21 announced. So we think that's positive, but we also have an account team calling on Sprint
22 directly in Kansas City, which we're hopeful the 2 points lead to the right end." (*Id.*, ¶ 56; *see
23 also* ¶ 4(b).) Plaintiffs alleged in their SCAC that this representation was false and misleading
24 when made because the merger posed a serious threat to Ditech and Defendants "were aware
25 that their business would be materially impacted at least two months before they finally
26 disclosed this fact to the public." (SCAC, ¶ 50.) To support their allegation of falsity, Plaintiffs
27 relied on information obtained by confidential witnesses who worked at companies that
28 installed Nextel orders of Ditech's echo cancellation equipment. Plaintiffs pointed to emails

5

1 from these third-party companies dated in mid-March and early April 2005 showing that the
2 Nextel orders of Ditech's echo cancellation equipment referred to them had dropped
3 significantly. (*Id*., ¶ 51.)

4 Confidential witnesses 2 through 6 are current and former employees of Scope
5 Networks, a company that installed approximately half of Nextel's orders of Ditech's echo
6 cancellation equipment. (*Id*., ¶¶ 23(b)-(e), 55.) Confidential Witness 2 was employed by Scope
7 Networks as a project technician from early 2005 until after the Class Period. (*Id*., ¶ 23(b).)
8 Confidential Witness 3 was a field technician with Scope Networks throughout the Class
9 Period. (*Id*., ¶ 23(c).) Confidential Witness 4 worked for Scope Networks as a project manager
10 for several years, including through out the Class Period. (*Id*., ¶ 23(d).) Confidential Witness 5
11 worked as a field technician for Scope Networks throughout the Class Period. (*Id*., ¶ 23(e).)
12 Throughout the Class Period, Confidential Witness 6 worked as an installation supervisor for
13 Pride Communications, "a company that performed installation work for Nextel that included
14 installation of Ditech echo cancellation devices." (*Id*., ¶ 23(f).) All of these confidential
15 witnesses installed Ditech equipment for Nextel. (*Id*., ¶¶ 23(b)-(f).)

16 Plaintiffs alleged that according to Confidential Witnesses 2 through 5, the number of
17 Ditech installations for Nextel "declined dramatically following the announcement of the
18 Nextel-Sprint merger," and according to Confidential Witnesses 3 and 4, the installations
19 "ultimately 'dropped off completely' as a result of the merger." (*Id*., ¶ 56.) According to
20 Confidential Witnesses 3, "it was common knowledge at Scope that once Nextel merged with
21 Sprint, 'everything would stop for at least a year,' until the newly merged Sprint-Nextel was
22 'reorganized.'" (*Id*.) Confidential Witness 6 confirmed that Pride Communications'
23 installations of Ditech equipment for Nextel similarly declined after the announcement of the
24 merger. (*Id*., ¶ 60.)

25 On May 26, 2005, the "truth" about the Nextel-Sprint merger was revealed when Ditech
26 announced that orders from Nextel dropped almost 60% as a result of the merger. (*Id*., ¶¶ 6,
27 51.)

28

6

In their TCAC, Plaintiffs include the following additional allegations: According to Confidential Witness 7, sometime during the Class Period, Montgomery stated at a company meeting that the merger could go in either one of two ways for Ditech, one way being that the merged entity might not order any additional product from Ditech. (TCAC, ¶ 62.)

**Scienter Allegations**

As in their two prior complaints, Plaintiffs' additional allegations relating to scienter in the TCAC focus solely on stock sales by insiders. (TCAC, ¶¶ 85-92.) With the exception of some additional argument as to what meaning should be attributed to such stock sales and whether Defendants' unexercised options were appropriated valued, the SCAC does not provide any more information regarding the amount and timing of stock sales by Montgomery or Tamblyn, or any other insider, during the Class Period.

**ANALYSIS**

Plaintiffs allege that throughout the Class Period Defendants publicly made misrepresentations concerning VQA orders and the Sprint-Nextel merger between August 24, 2004 and May 26, 2005 (the "Class Period").[1] Section 10(b) of the Securities Exchange Act provides, in part, that it is unlawful "to use or employ in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b).

Rule 10b-5 makes it unlawful for any person to use interstate commerce:

(a) To employ any device, scheme, or artifice to defraud;
(b) To make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or;
(c) To engage in any act, practice, or course of business that operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

---

[1] The Court has not yet certified a class and refers to the time period involved as the "Class Period" for ease of reference.

7

To plead a claim under section 10(b) and Rule 10b-5, a plaintiff must allege (1) a misrepresentation or omission, (2) of material fact, (3) made with scienter, (4) on which the plaintiff justifiably relied, (5) that proximately caused the alleged loss. *Binder v. Gillespie*, 184 F.3d 1059, 1063 (9th Cir. 1999). Additionally, as in all actions alleging fraud, a plaintiff must state with particularity the circumstances constituting fraud. *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 193 (9th Cir. 1999); Fed. R. Civ. P. 9(b).

Plaintiffs also claim that individual defendants are liable pursuant to Section 20(a) of the Securities Exchange Act, which provides for derivative liability for those who control others found to be primarily liable under the provisions of that act. *See In re Ramp Networks, Inc. Sec. Lit.*, 201 F. Supp. 2d 1051, 1063 (N.D. Cal. 2002). Where a plaintiff asserts a Section 20(a) claim based on an underlying violation of section 10(b), the pleading requirements for both violations are the same. *Id.*

**A.     Applicable Pleading Standards: Private Securities Litigation Reform Act.**

In order to limit the number of frivolous private securities lawsuits, Congress enacted the PSLRA in December of 1995, and created heightened pleading standards for such lawsuits. 15 U.S.C. § 78u-4(b). The PSLRA requires that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B). Furthermore, the PSLRA requires that the plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

The heightened standard set by the PSLRA was intended to put an end to securities fraud lawsuits that plead "fraud by hindsight." *In re Silicon Graphics, Inc. Sec. Lit.*, 183 F.3d 970, 988 (9th Cir. 1999). "The PSLRA significantly altered pleading requirements in private securities fraud litigation by requiring that a complaint plead with particularity both falsity *and* scienter." *In re Vantive Corp. Sec. Lit.*, 283 F.3d 1079, 1084 (9th Cir. 2002) (citing *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001)) (emphasis added). "Thus the complaint must allege

8

1  that the defendant made false or misleading statements either intentionally or with deliberate
2  recklessness or, if the challenged representation is a forward looking statement, with 'actual
3  knowledge . . . that the statement was false or misleading.'" *Id.* at 1085 (citing 15 U.S.C. § 78u-
4  5(c)(1)(B)(I)).  This is often accomplished "by pointing to inconsistent contemporaneous
5  statements or information (such as internal reports) made by or available to the defendants."
6  *Yourish v. California Amplifier*, 191 F.3d 983, 993 (9th Cir. 1999) (quoting *In re GlenFed Sec.*
7  *Lit.*, 42 F.3d 1541, 1549 (9th Cir. 1991) (*en banc*)); *see also id.* at 994 (discussing insufficiency
8  of plaintiffs' allegations with regard to the non-disclosure of confidential non-public
9  information).

10  Under the PSLRA, a complaint still is construed in the light most favorable to the non-
11  moving party and all material allegations in the complaint are taken to be true.  *Silicon*
12  *Graphics*, 183 F.3d at 983.  To determine whether a plaintiff has pled a strong inference of
13  scienter, however, "the court must consider all reasonable inferences to be drawn from the
14  allegations, including inferences unfavorable to the plaintiffs." *Gompper v. VISX, Inc.*, 298
15  F.3d 893, 897 (9th Cir. 2002).  The Court "should consider all the allegations in their entirety,
16  together with any reasonable inferences therefrom, in concluding whether, on balance, the
17  plaintiffs' complaint gives rise to the requisite inference of scienter." *Id.*  "Conclusory
18  allegations of law and unwarranted inferences, however, are insufficient to defeat a motion to
19  dismiss." *In re Northpoint Communications Group, Inc. Sec. Lit.* (*Northpoint II*), 221 F. Supp.
20  2d 1090, 1094 (N.D. Cal. 2002).

21  Finally, the Court may consider the facts alleged in the complaint, documents attached
22  to the complaint, documents relied upon but not attached to the complaint when the authenticity
23  of those documents is not questioned, and other matters for which the Court can take judicial
24  notice. *Northpoint II*, 221 F. Supp. 2d at 1094; *see also Silicon Graphics*, 183 F.3d at 986.

25  **B.     Request for Judicial Notice.**

26  Defendants request that the Court take judicial notice of Ditech's press releases, SEC
27  filings, and transcripts of Ditech's conference calls, all of which are referenced in the
28  Complaint, are publicly filed documents, or are otherwise the proper subject of judicial notice.

9

1  Plaintiffs do not dispute the accuracy of the documents attached to the request, and the
2  requested documents are the types of documents of which this Court properly may take judicial
3  notice. *See, e.g., In re Calpine Corp. Sec. Lit.*, 288 F. Supp. 2d 1054, 1076 (N.D. Cal. 2003)
4  (court "may properly take judicial notice of SEC filings and documents expressly referenced" in
5  a complaint"); *see also Plevy v. Haggerty*, 38 F. Supp. 2d 816, 821 (C.D. Cal. 1998).
6  Accordingly, the Court GRANTS Defendants' request.

7  **C.    Plaintiffs Fail To Plead Sufficient Facts to Demonstrate Falsity.**

8  The PSLRA requires that Plaintiffs allege with the requisite particularity each statement
9  alleged to be false or misleading, the reason or reasons why the statement was false or
10 misleading, and if those allegations are made on information and belief, all facts on which that
11 belief is formed. *See* 15 U.S.C. § 78u-4(b)(1)(B); *see also Employers Teamsters Local Nos.*
12 *175 and 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1134 (9th Cir. 2004). Plaintiffs
13 allege that Defendants made two types of alleged false misrepresentations regarding: (1)
14 Defendants' VQA orders and (2) the Nextel-Sprint merger. Plaintiffs fail to meet this standard
15 with respect to either type of alleged misrepresentation.

16     **1.    VQA Orders.**

17 Plaintiffs allege that Defendants misrepresented that Ditech had received two orders
18 worth over five million dollars from two new customers in Asia. (TCAC, ¶ 4(a).) In a press
19 release issued on August 24, 2004, Ditech announced it had "secured orders to deploy its
20 [VQA] solutions with two new customers in Asia .... totaling in excess of five million dollars."
21 (*Id*., ¶ 31.) On a conference call later that day, Montgomery stated: "Although we don't know
22 yet precisely where Q2 VQA revenues will be, given our Q4 revenues and orders in excess of
23 $5 million already in Q2, you can see the beginning of a trend line that gives us real confidence
24 in our VQA business." (*Id*., ¶ 32.) On November 3, 2004, Ditech announced that these orders
25 had not yet shipped, but "maintained that this was merely a 'delay' and that they still expected
26 the orders to ship." (*Id*., ¶¶ 4, 40, 41.) Defendants further announced on that day that the delay
27 was due to management changes within the largest of the two new customers from China, but
28

10

that the customer had reconfirmed the new shipping schedule and that Ditech was "taking steps to ensure smooth delivery of these orders in the second half of this fiscal year." (*Id.*, ¶ 41.)

Plaintiffs allege that the orders were not actually "secured" either because Ditech was seriously deficient in numerous shipping requirements which would prevent any shipments to China or because the shortly after the orders were announced, one of the Asian customers was bought out by another company and/or reorganized, resulting in the expiration of the original company's 'letter of credit'– a prerequisite for acceptance of international orders in China." (TCAC, ¶ 4(a).) Plaintiffs further alleged that after the letter of credit expired, one of the Asian customers treated its relationship with Ditech as a mere opportunity to "evaluate" Ditech's VQA technology as a potential alternative to its normal supplier, Tellabs. (*Id.*)

In Plaintiffs' SCAC, Plaintiffs' sole support for their position that Defendants' statements regarding the VQA orders were false when made was information they obtained from Confidential Witness 1. The Court found the information provided by Confidential Witness 1 alleged in the SCAC was insufficient to demonstrate a basis for believing Defendants' statements regarding the VQA orders were false when made. Confidential Witness 1 said he noticed several problems with the shipping documents several weeks before the statements were made on August 24, 2004 and that in mid-August of that he year he advised Tamblyn of the deficiencies and of their need to correct them before the VQA product could be shipped to China. (SCAC, ¶ 37.) According to Confidential Witness 1, Tamblyn waited several weeks to take any action on this issue. (*Id.*) Plaintiffs failed to allege any facts which would demonstrate the alleged deficiencies would be difficult or time consuming to fix. Nor did Plaintiffs allege what action Tamblyn did take or, more importantly, what additional actions would have been necessary to correct the deficiencies before the VQA product could be shipped internationally.

The limited additional facts Plaintiff allege in their TCAC do not alter the Court's analysis. Plaintiffs allege that Ditech had to comply with the EAR, a complicated regulatory scheme, in order to ship products to China and that, generally, compliance efforts can take

11

1  months. However, Plaintiffs do not allege any specific facts to support an inference that the
2  deficiencies alleged by Plaintiffs would take months to correct.

3        Moreover, as the Court noted in its order finding the allegations in the SCAC
4  insufficient, the alleged misrepresentations Plaintiffs point to merely state that VQA orders
5  were secured, not that the orders were promised to be shipped by a certain date or that the
6  orders were time sensitive. Notably, Ditech did announce that it shipped $0.5 million of VQA
7  product to a customer in China before January 31, 2005. (RJN, Ex. J.) Plaintiffs do not
8  contend that Ditech did not actually ship this product. Considering that Ditech actually did ship
9  VQA product to Asia after the announcements of the two orders were made, Plaintiffs do not
10 allege facts to demonstrate that when Ditech announced the two orders it knew that it would not
11 be able to ship product to Asia based on its non-compliance with export shipping regulations.

12       The Court also found Plaintiff's allegations in the SCAC regarding the alleged
13 expiration of the letter of credit similarly deficient. Plaintiffs alleged that Confidential Witness
14 1 learned at quarterly meetings attended by Montgomery and Tamblyn that the letter of credit
15 from the first company expired when the company was bought out and/or reorganized and that
16 Ditech was never able to secure a letter of credit from the second company. (*Id.*, ¶¶ 43-45.)
17 However, Plaintiffs did not allege when this information was conveyed to Montgomery and
18 Tamblyn, who conveyed it, or the substance of what was allegedly conveyed. Although
19 Plaintiffs alleged that, according to Confidential Witness 1, managers stated that the VQA
20 orders were not going to ship, Plaintiffs failed to allege who the managers were, how or when
21 they obtained such knowledge, or exactly what they knew. (*Id.*, ¶¶ 44-45.) For example, it is
22 not clear whether they said the VQA products would not ship on a particular date or that they
23 would never be shipped. Therefore, the Court found that Plaintiffs allegations were insufficient
24 to support a belief that, when the alleged statements were made, Defendants knew that the letter
25 of credit from the original customer had expired and that Ditech knew it could not receive a new
26 one from the new or reorganized company.

27       Plaintiffs did not cure these deficiencies in their TCAC. Despite having notice of the
28 Court's concerns, Plaintiffs did not allege any additional information regarding when the

12

1 quarterly meetings were held or what information was conveyed at each meeting. Besides
2 identifying one of the managers who made comments that the VQA orders were not going ship,
3 Plaintiffs did not allege any additional facts regarding what information this, or any other
4 managers, knew or what their statements meant in terms of timing.

5 In their TCAC, Plaintiffs allege that the information regarding the obstacles to shipping
6 were obtained by Ditech managers "contemporaneously with the relevant events" because such
7 information was disclosed to Confidential Witness 1 during the Class Period. (TCAC, ¶ 52.)
8 However, the alleged false statements regarding the VQA orders were made in August and
9 November 2004 and the Class Period continued until May 26, 2005. (TCAC, ¶ 24.) Therefore,
10 such allegation fails to provide any information indicating that Ditech knew about obstacles to
11 shipping, let alone knowledge that such alleged obstacles were insurmountable, before the
12 alleged misrepresentations were made.

13 Nor do Plaintiffs' additional allegations regarding Ditech's efforts to win VQA orders
14 from a customer in Asia provide any more support for Plaintiffs' contentions that the statements
15 made in August and November 2004 were false when made. Plaintiffs' allegations are vague as
16 to when these alleged efforts began, alleging only that such efforts continued "well into 2005."
17 (TCAC, ¶ 43.) Moreover, it is not clear from Plaintiff's allegations whether Ditech was
18 attempting to obtain new orders or whether Ditech was attempting to keep one of the two orders
19 announced in August 2004.[2] Accordingly, the Court concludes that Plaintiffs fail to sufficiently

---

[2] In their opposition brief, Plaintiffs assert additional allegations from Confidential Witness 8 that they would plead if given leave to amend yet another time. Even if the Court were to consider giving Plaintiff a fourth opportunity to allege their claims sufficiently, the allegations described in Plaintiffs' opposition brief would not assist Plaintiff. According to Plaintiffs, Confidential Witness 8 began working at some unspecified date in November 2004. Thus, it is not clear whether Confidential Witness 8 began working at Ditech, let alone obtained sufficient information to be knowledgeable regarding the orders in Asia, *before* November 18, 2004, when the last alleged misrepresentation regarding the VQA orders was made. With respect to the Nextel-Sprint merger, Confidential Witness 8 contends that Defendants Tamblyn and Montgomery knew by the March 2005 that revenues from Nextel substantially declined and that the merging entity placed a capital expenditure freeze on all new hardware until the company worked out its strategy for the future. Similar to the allegations from Confidential Witnesses 2 through 6, discussed below, such allegations fail to show that Defendants knew, as of February 17, 2005 when the alleged misrepresentation was made, that the merger would be detrimental for Ditech or that any such revenue declines would be permanent.

13

allege falsity with respect to the alleged misrepresentations as to the VQA orders. *See* 15 U.S.C. § 78u-4(b)(1)(B).

### 2. Nextel-Sprint Merger.

Plaintiffs contend that Defendants' positive statements regarding proposed merger between Sprint and Nextel made in mid-February 2005 were false and misleading. In their SCAC, to support their contention that Defendants knew, when the statements were made, that they were false, Plaintiffs relied on statements from confidential witnesses who worked at companies that installed Nextel's orders of Ditech's echo cancellation equipment. In rejecting such allegations as sufficient to demonstrate falsity, the Court noted that at most, the allegations provide anecdotal information that the third-party witnesses observed that the numbers of orders declined starting in March 2005, or perhaps when the merger was announced in December 2004. Plaintiffs failed not allege any facts to support a belief that such declines observed by the confidential witnesses were permanent, or more significantly, that Defendants *knew as of mid-February* that it would lose Nextel's business as a result of the merger. Plaintiffs failed to allege any material non-public information known by Defendants at the time the statement was made which would have rendered it false. Again, Plaintiffs did not cure these pleading deficiencies in their TCAC.

Plaintiffs additional allegation that, according to Confidential Witness 7, during a company meeting held "about the time of the merger announcement," Montgomery stated that the merger could go in either "one of two ways," with one of those ways being that the merged entity might not order any additional product from Ditech, does not assist Plaintiffs. Notably, the alleged misrepresentation did not state without hesitation that the merger was going to be good for Ditech. Rather, it is clear from the context of the entire paragraph Plaintiffs quote that Montgomery expressed that he was hopeful, but not certain, that the merger would be good for Ditech. Montgomery's statement was as follows:

> The Nextel-Sprint merger is actually, we think, quite good for us in that the key strategic people on the technical side are actually going to be the Nextel players, and this is what we've seen publicly announced. So we think that's positive, but we also have an account team calling on Sprint directly in Kansas City, which we're hopeful the 2 points lead to the right end.

14

1  (TCAC., ¶ 56)  Stating that the merger could go one of two ways for Ditech does not contradict
2  the above statement or indicate that it was false.  Accordingly, the Court concludes that
3  Plaintiffs fail to sufficiently allege falsity with respect to the alleged misrepresentations as to the
4  Nextel-Sprint merger.  *See* 15 U.S.C. § 78u-4(b)(1)(B).

**D.    Plaintiffs fail to Plead Sufficient Facts to Demonstrate Scienter.**

The PSLRA also requires a plaintiff to allege particular facts giving rise to a strong inference that "the defendant made false or misleading statements either intentionally or with deliberate recklessness." *Vantive*, 283 F.3d at 1085; 15 U.S.C. § 78u-4(b)(2).  Where the pleadings are not sufficiently particularized or where, even taken as a whole, they do not raise a strong inference of scienter, dismissal pursuant to Rule 12(b)(6) is proper.  *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1038 (9th Cir. 2002).  Moreover, to determine whether a plaintiff has pled a strong inference of scienter, "the court must consider all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." *Gompper*, 298 F.3d at 897.

In addition to the alleged misrepresentations, Plaintiffs relied on Montgomery's and Tamblyn's stock sales to support their scienter allegations.  In the Court's orders dismissing Plaintiffs' prior complaints, the Court found that the relatively low percentage of stocks sold by Montgomery and Tamblyn during the Class Period were not suspicious enough to raise a strong inference of scienter.  Additionally, given that Montgomery sold more stocks during the four months preceding the Class Period, his sales during the Class Period were not dramatically out of line with prior trading practices.  The Court also noted that the absence of allegations that the remaining corporate insiders sold a large portion of their Ditech stocks further defeated any inference of scienter.  Plaintiff has not alleged *any* additional facts regarding stock sales by Montgomery, Tamblyn, or other insiders, or any other facts to support an inference of scienter.

The only additional allegation in their TCAC regarding stocks is a brief allegation, based on information and belief, that Defendants' unexercised options were improperly "spring

loaded" and/or tainted through improper backdating. Plaintiffs do not allege any facts to support this allegation regarding spring loading or backdating generally, or more importantly, with respect to the Montgomery's or Tamblyn's options at issue in this action. Moreover, as Defendants argue, even if Plaintiffs did allege sufficient facts to support such accusations, spring loading or backdating could affect the ultimate value of such options, but would not eliminate the options. Thus, the such options would still be considered in determining what percentage of Defendants' holdings were sold during the Class Period. Accordingly, the Court finds that Plaintiffs' allegations fail to raise a strong inference of scienter.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' motion to dismiss with prejudice.

**IT IS SO ORDERED.**

Dated: October 11, 2007

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE